UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID HOFFMAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 09-CV-79-B-H |
| | ) | |
| STATE OF CONNECTICUT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED[1] RECOMMENDED DECISION ON MOTION TO DISMISS**

The State of Connecticut commenced an action in Maine Superior Court against David Hoffman, Valerie Hoffman, and Peaceful Properties, LLC, seeking to set aside a conveyance of Maine realty made to Peaceful Properties by David Hoffman and Valerie Hoffman.  That action relates to another action commenced by the State of Connecticut, in Connecticut, against Valerie Hoffman and two corporations owned by her, for allegedly unfair trade practices.  In the instant action, a third and separate action, David Hoffman and Peaceful Properties are pursuing claims against the State of Connecticut, the Commissioner of the Connecticut Department of Consumer Protection and assistant attorneys general based on allegations that the defendants, among other things, filed in the fraudulent transfer action an *ex parte* attachment motion supported by a bogus affidavit.  Hoffman and Peaceful Properties contend that this conduct violated their substantive due process rights and was otherwise tortious under state common law, asserting six common

---

[1]     The only changes in this recommended decision relate to citations to unpublished opinions of lower courts. I have now added the county or district location of the state superior court issuing the decision.  The decisions are unpublished and are readily available only on one commercial electronic publishing entity.  I have therefore used only those citations in the body of the opinion, in addition to the official record cite of the Maine Superior Court and Superior Court of Connecticut docket numbers and dates of entry on the dockets.

law tort claims.  Hoffman and Peaceful Properties filed this action in the Superior Court, but the defendants removed it based on the presence of the federal claim and the diversity of the parties' citizenship.  Now pending before the Court is a motion to dismiss the action, *in toto*.  The Court referred the motion for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  I recommend that the Court grant the motion, but only in part.

## THE CLAIMS

David Hoffman and Peaceful Properties, LLC, base their action on the following factual allegations set forth in a complaint verified by Mr. Hoffman in January of 2009.  For purposes of the Rule 12(b)(6) challenges asserted by the defendants, all non-conclusory factual allegations are presumed to be true, whether they are disputed or not.  For purposes of personal jurisdiction challenges, most, but not all, of  the verified allegations are taken as true, as explained in the subsequent discussion.

David Hoffman was residing in the State of Florida in January of 2009 when the complaint in this action was filed.  (Compl. ¶ 1.)  However, Mr. Hoffman attests that he is a Maine resident and has been for the past three years.  (David Hoffman Aff. ¶¶ 2, 8, Doc. No. 16-2.)  Mr. Hoffman is the sole member of Peaceful Properties, a Maine limited liability company in good standing.  (Compl. ¶ 2.)  Mr. Hoffman is a builder by profession.  (Id. ¶ 3.)  He is married to Valerie Hoffman, who resides in the State of Florida.  (Id. ¶ 4.)  Valerie Hoffman owns two corporations, Sunrise Herbal Remedies, Inc., and Sage Advice, Inc.  (Id. ¶ 5.)  David Hoffman does not have an ownership interest or operational role in either of Valerie Hoffman's corporations.  (Id. ¶ 6.)  Nor does Valerie Hoffman have an ownership interest or operational role in Peaceful Properties.  (Id. ¶ 7.)

The Connecticut Department of Consumer Protection is an agency of the State of Connecticut.  (Id. ¶ 8.)  Defendant Jerry Farrell, Jr., is the Department's commissioner.  (Id. ¶ 9.) Defendants Matthew F. Fitzsimmons, Jose Rene Martinez, and Philip Rosario are all assistant attorneys general in the Connecticut Office of the Attorney General.  (Id. ¶¶ 10-12.)

In May 2005, the Department served a civil investigation demand ("CID") against Sunrise Herbal Remedies, Inc.  (Id. ¶ 13.)  The CID did not name Sage Advice, David Hoffman, or Valerie Hoffman.  (Id. ¶ 14.)  Several years earlier, in 2003, the Hoffmans acquired a parcel of undeveloped land in Winter Harbor, Maine.  (Id. ¶ 17.)  Neither Sunrise Herbal nor Sage Advice had any interest in that property.  (Id. ¶ 18.)  Between 2005 and 2006, David Hoffman made certain improvements to the property, planning to develop the property and erect a luxury home for resale.  (Id. ¶¶ 19-22.)  In September 2006, Hoffman contacted a Maine attorney to prepare a deed to transfer the property to Peaceful Properties, an entity that he set up and incorporated on his own.  (Id. ¶¶ 22-23.)  In October 2006, Valerie Hoffman executed the deed and conveyed her interest in the property, valued by the Hoffmans at $200,000, to Peaceful Properties.  (Id. ¶¶ 24-25.)  According to David Hoffman, as of the date of transfer, Valerie Hoffman had not heard from the Department concerning the CID in over a year.  (Id. ¶ 25.)  David Hoffman attests that he realized, in late December 2006 or early January 2007, that he had not received back from a Maine attorney the recorded deed transferring the Winter Harbor property to Peaceful Properties. (Id. ¶ 27.)  He reports that the attorney indicated that the deed was lost somewhere between the attorney's office and the Hancock County Registry of Deeds.  (Id. ¶ 28.)  Consequently, the deed was not recorded until February 27, 2007, although the deed was dated October 6, 2006.  (Id. ¶ 29.)

On February 21, 2007, the State of Connecticut filed a Connecticut Unfair Trade Practices Act action ("trade practices action")[2] against Valerie Hoffman, Sunrise Herbal, and Sage Advice.  David Hoffman and Peaceful Properties allege, "upon information and belief," that the trade practices action was preceded by an insufficient and flawed investigation by the Department.  (Id. ¶¶ 30.)  Although Connecticut did not pursue the trade practices action against either  David Hoffman or Peaceful Properties, Connecticut did commence a fraudulent transfer action and filed an *ex parte* motion for attachment in the Hancock County Superior Court in Maine, seeking attachment and trustee process against David Hoffman and Peaceful Properties in the amount of $1,517,600 ("the fraudulent transfer action").  (Id. ¶¶ 31-32.)

According to David Hoffman and Peaceful Properties, the defendants' conduct in connection with the *ex parte* attachment motion in the fraudulent transfer action is actionable because:

> The legal and factual bases for the action and for the *ex parte* motion and attachment were wholly lacking; the action was unreasonable, vexatious, legally unnecessary and filed in reckless disregard for the rights of the Plaintiffs herein, was intended to harass, and even the amount of damages claimed were falsely inflated intentionally, maliciously, or in reckless disregard for the truth.  Under prevailing court precedent, it would have been impossible for the State of Connecticut, even by its now-known exaggerated damages calculations of approximately $80,000, to recover damages and penalties in the CUTPA action in the extraordinary amount of $1,517,600.

(Id. ¶ 32.)  They describe as false or reckless an assertion in the attachment motion and accompanying affidavit that Valerie Hoffman transferred her interest in the Winter Harbor property to Peaceful Properties after the filing of the Connecticut unfair trade practices action

---

[2]        The plaintiffs refer to this as the "CUTPA action."

4

against her.  (Id. ¶ 33.)  They acknowledge, however, that the deed was recorded six days after

the commencement of the unfair trade practices action.  (Id. ¶ 29.)

David Hoffman and Peaceful Properties otherwise ascribe the following statements to the

defendants, all of which are alleged to have been made with knowledge they were false or with

reckless disregard for the truth:

> That a house had been constructed on the Winter Harbor Property that
> substantially increased the value of the Maine Property;
>
> That the State of Connecticut had engaged in "numerous communications" with
> Valerie Hoffman regarding the nature of allegations against her and that a civil
> suit based on those allegations was likely;  and
>
> That the CID was directed at David Hoffman and Valerie Hoffman individually,
> when in fact no CID was ever directed to David Hoffman at all, and never to
> Valerie Hoffman individually.

(Id. ¶¶ 34-36.)  The *ex parte* motion filed on behalf of the State of Connecticut was supported by

Defendant Fitzsimmons's affidavit swearing to the truth of the foregoing, block-quoted

assertions.  (Id. ¶ 37.)  David Hoffman and Peaceful Properties allege that Fitzsimmons had

actual knowledge of the falsity of those statements and allegations, or filed the affidavit in

reckless disregard for the truth.  It is also alleged that the individual co-defendants in this action

acted in concert, aided and abetting, and/or approved and ratified the filing of the false affidavit,

the *ex parte* motion, and the fraudulent transfer action.  (Id.)  None of the defendants has filed an

appearance in the Maine Superior Court on behalf of the State of Connecticut in the fraudulent

transfer action.  (See Docket Record, Doc. No. 19-2.)

On July 25, 2007, the Superior Court granted the *ex parte* attachment motion.  (Id. ¶ 38.)

The State of Connecticut asserted a lien on the Winter Harbor property and recorded its lien in

the Hancock County Registry of Deeds.  (Id. ¶ 39.)  The State of Connecticut also filed a *lis*

*pendens* in the Hancock County Registry of Deeds.  (Id. ¶ 40.)  As of this date, David Hoffman had completed the groundwork, foundation and part of the framing of the home on the Winter Harbor property.  (Id. ¶ 42.)  As a result of the lien and the notice of *lis pendens,* Bar Harbor Bank & Trust suspended a loan agreement with David Hoffman and Peaceful Properties, thereby frustrating completion of the Winter Harbor project.  (Id. ¶¶ 43-44.)  Similar notices filed in Connecticut against a property owned by David Hoffman scared away a prospective buyer who had an interest in the Connecticut property and a willingness to buy that property for an anticipated $1.4 million.  (Id. ¶¶ 45-46.)  These developments froze David Hoffman's business operation and prevented him from practicing his trade because all of his operating capital was tied up in these properties.  (Id. ¶¶ 47-48.)  Although the Maine Superior Court has dissolved the attachment, the notice of *lis pendens* is still in place against the Winter Harbor property because Connecticut refuses to release it.  (Id. ¶¶ 52-53.)

In addition to the foregoing allegations, the plaintiffs also allege, based upon information and belief, that the defendants made statements, orally and in writing, to third parties in the community to the effect that the plaintiffs had participated in a fraudulent transfer of the Winter Harbor Property.  (Id. ¶¶ 55, 82-83.)

According to Hoffman and Peaceful Properties, this factual matrix supports the following claims, by count:  (I) slander of title;  (II) a substantive due process violation under 42 U.S.C. § 1983;  (III) abuse of process;  (IV) wrongful use of civil proceedings;  (V) intentional infliction of emotional distress;  (VI) defamation;  and (VII) tortious interference with an advantageous economic relationship.  They request money damages on all counts.  The plaintiffs are suing the individual defendants in both their official and personal capacities.  (Id. ¶ 50.)

6

DISCUSSION

The individual defendants, Farrell, Fitzsimmons, Martinez, and Rosario, contend that this Court lacks personal jurisdiction over them.  (Mot. to Dismiss at 4, Doc. No. 9.)  Among other arguments, they assert that the State of Connecticut's commencement of litigation against Hoffman and Peaceful Properties is not sufficient to confer jurisdiction over state employees.  (Id. at 5.)  They also contend that an exercise of jurisdiction here would not be fair because the tort claims would be time barred if brought in Connecticut just as they would be barred in Maine, if they were brought against the State of Maine.  (Id. at 6.)  In addition, the defendants request dismissal of the action based on various doctrines—sovereign immunity, absolute immunity, and qualified immunity.  (Id. at 7-14.)  They also raise common law absolute privileges and a contention that the slander of title claim is a compulsory counterclaim to the fraudulent transfer action.  (Id. at 19, 23-24.)   As to the sole federal claim, I conclude that it is not actionable.  Because the Court's subject matter jurisdiction is based in part on diversity of citizenship, it cannot simply remand the state claims.[3]  As for those claims, I conclude that the claims of defamation, tortious interference, and abuse of process remain and that a Maine state court might not confer sovereign immunity based on comity to the relevant defendants (Fitzsimmons and the State of Connecticut), at the pleadings stage, with respect to these claims.  I also conclude that the Court has personal jurisdiction over defendant Fitzsimmons with respect to claims premised on contacts involving wrongful use of Maine civil proceedings, abuse of Maine process, and claims arising from the making of false and defamatory statements within Maine.

---

[3]       If the Court were to determine that *in personam* jurisdiction could not be exercised over any individual defendant, then dismissal of the solitary federal claim would call for remand of the action to the state court because there would be no basis for exercise of diversity jurisdiction over the state law claims if the sole defendant was the State of Connecticut.  For purposes of diversity jurisdiction, "it is well settled that a suit between a State and a citizen or a corporation of another State is not between citizens of different States."  State Highway Comm'n v. Utah Constr. Co., 278 U.S. 194, 200 (1929).

7

A.     **Personal Jurisdiction**

When a motion to dismiss for lack of personal jurisdiction is filed pursuant to Federal Rule of Civil Procedure 12(b)(2), it is the plaintiff who bears the burden of establishing that personal jurisdiction is proper.  United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001).  The burden is to develop a record that, "if credited, is enough to support findings of all facts essential to personal jurisdiction."  Snell v. Bob Fisher Enter., Inc., 115 F. Supp. 2d 17, 20 (D. Me. 2000) (quoting Boit v. Gar-Tec Prod., 967 F.2d 671, 675 (1st Cir. 1992)).  Both parties may participate in the development of the jurisdictional record.  However, the plaintiff's properly supported proffers of evidence are accepted as true and all evidentiary disputes are resolved in the plaintiff's favor.  Id.

This Court has original jurisdiction over federal questions arising under the Civil Rights Act.  Because the Civil Rights Act does not provide for nationwide service of process, the defendants' amenability to suit in Maine turns on their amenability to service of process issued by a Maine court.  Lorelei Corp. v. County of Guadalupe, 940 F.2d 717, 719-20 (1st Cir. 1991); Fed. R. Civ. P. 4(k)(1)(A).  Because the State of Maine's longarm statute, 14 M.R.S. § 704-A, permits service to the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment, local law does not restrict the Court's jurisdictional reach beyond the usual minimum contacts analysis.  Lorelei Corp., 940 F.2d at 720.

Among the specific acts that will ground an exercise of specific jurisdiction over an out-of-state defendant by a Maine court is "[d]oing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within the State."  14 M.R.S. § 704-A(2)(B).  Such acts are sufficient to support jurisdiction where the plaintiffs demonstrate (1) that their claims arise from, or are related to, the defendant's forum contacts;  (2) that those contacts reflect the

8

defendant's "purposeful availment" of the benefits and protections afforded by Maine law; and (3) that the exercise of jurisdiction will not be inconsistent with traditional notions of fair play and substantial justice, as measured by a collection of gestalt factors:

> the defendant's burden of appearing; the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the several States in furthering fundamental substantive social policies.

N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 26 (1st Cir. 2005).

In this case the individual defendants argue that they are beyond the reach of this Court. They say that they are merely the employees of the State of Connecticut and that they did not personally bring any action against the plaintiffs in this forum. (Mot. to Dismiss at 4-6.)

"In order to require an employee of a foreign corporation—named individually as a codefendant along with his or her employer—to defend a lawsuit in Maine, the exercise of jurisdiction over the person must be reasonable." RF Tech. Corp. v. Applied Microwave Tech., Inc., 369 F. Supp. 2d 24, 32 (D. Me. 2005). In Maine, relevant personal jurisdiction contacts on the part of the individual employee include the employee's contacts made on behalf of the corporation. Id. ("[A]n individual employee's corporate contacts—even in the absence of personal contacts—with Maine are sufficient to satisfy the Maine long-arm statute and the federal Constitution."). Moreover, when it comes to the torts of wrongful use of civil proceedings and abuse of process, it is generally recognized that one may be subject to liability even though he is not a party in whose name the proceedings are invoked or process is issued. Restatement (Second) of Torts § 674 cmts. a & b; § 677; § 682 cmt. a, illus. 3 (1977).

The Defendants do not suggest that personal jurisdiction would not lie against the State of Connecticut on claims arising directly from its commencement of the fraudulent transfer

litigation and the filing of the attachment motion.  The question is whether the Court has

personal jurisdiction over the individual defendants based on an assumption that they are the

Connecticut officials or agents who steered the fraudulent transfer action on behalf of the State

of Connecticut, introduced allegedly fraudulent evidence in support of an *ex parte* attachment,

and made statements outside of litigation channels to third parties in Maine.  Because this action

is premised on personal contacts made by Fitzsimmons in the form of his submission of an

allegedly false affidavit, I am persuaded that a direct causal nexus exists between a purposeful

contact with Maine and the resulting claims (the former being a material element of the latter).  I

am also persuaded that there is no state that would be more interested than Maine is in the

alleged abuse of Maine civil process and defamatory and slanderous statements made in Maine

pleadings with respect to a citizen's character and title to Maine real estate.  I conclude that it

would not offend due process or be contrary to traditional notions of fair play and substantial

justice for the Court to exercise specific personal jurisdiction over Fitzsimmons.[4]   The other

individual defendants, Martinez and Rosario, two assistant attorneys general from Connecticut,

and Farrell, the Department of Consumer Protection's commissioner, are alleged to have acted in

concert, aided and abetting, and/or approved and ratified the filing of the false affidavit.  In other

words, the only allegations pertaining to these individuals are conclusory allegations that they

---

[4]        The defendants also argue that the plaintiffs' failure to comply with statutory limitations on claims against a
sovereign state and its agents (under Connecticut law) weigh against an exercise of jurisdiction when the Court
reaches the Gestalt factors.  (Id. at 6.)  The idea is that a Maine court would not exercise jurisdiction over another
state and its agents if that state's law bars the action based on a statute of limitation.  See Conn. Gen. Stat. § 4-148.
Because Maine law also imposes a limitation period (two years) on claims against the State of Maine, 14 M.R.S. §
8110, the defendants believe that a Maine court should appreciate the social policy behind such limitations and
should refuse to exercise personal jurisdiction over the defendants out of comity, because of the shared interest both
states have in seeing their social policies upheld.  (Mot. to Dismiss at 6, citing Harlow v. Children's Hosp., 432 F.3d
50, 68 (1st Cir. 2005)).  I do not find this argument persuasive because the theoretical absence of subject matter
jurisdiction based on an extension of sovereign immunity via principles of comity would not likely be treated by the
Law Court as dispositive of a personal jurisdiction question.

were co-conspirators with Fitzsimmons.  Neither the verified complaint nor Hoffman's affidavit (Doc. No. 16-2) provides an evidentiary basis for these conclusory allegations.

In a somewhat analogous situation this Court has opined that unaffiliated corporations in an antitrust case cannot be brought within the court's jurisdiction through the jurisdictional contacts of co-conspirators.  See In re New Motor Vehicles Canadian Export Antitrust Litig., 307 F. Supp. 2d 145, 157-58 (D. Me. 2004) ("I do not believe that the First Circuit would recognize a conspiracy theory of personal jurisdiction, whereby jurisdiction can be obtained over nonresident defendants based upon the jurisdictional contacts of co-conspirators.").  Unlike In re Motor Vehicles, here the defendants are agents of the State of Connecticut, not unaffiliated corporations.  However, in the present case there is no evidentiary basis to support the allegations that Farrell, Martinez, and Rosario aided and abetted Fitzsimmons or approved of the content of his affidavit.  It is not enough for Hoffman to attach a verification at the end of a complaint to give evidentiary quality to conclusory allegations, without describing the facts within his personal knowledge that form the basis for the conclusion and make it a reasonable inference to draw.  For the same reason, Hoffman cannot generate a prima facie showing with "information and belief" allegations about unspecified communications by unspecified individuals with third parties in Maine, even if those allegations are sworn.  There may have been grounds for jurisdictional discovery against the individual defendants, based on a proper showing, but the plaintiffs have failed to explain why the Court should infer that Fitzsimmons's investigative conclusions should be attributed to anyone other than the State of Connecticut, Fitzsimmons, or Connecticut's Maine counsel.  Hoffman has simply failed to make the necessary evidentiary showing regarding the actions of the alleged co-conspirators so as to justify the exercise of personal jurisdiction over them in the State of Maine.  See also Sebago, Inc. v. Pena,

11

No. CV-99-226, 1999 Me. Super. Lexis 189 (Me. Super. Ct., Cum. Cty., July 8, 1999) (Crowley, J.) (accepting that jurisdiction by conspiracy can be done, and exercising jurisdiction on that ground, but in a case involving a matrix of non-conclusory allegations and assorted evidence); Porrazzo v. Karofsky, No. CV-97-144, 1997 Me. Super. Lexis 282 (Me. Super. Ct., Cum. Cty., Sept. 23, 1997) (Calkins, J.) (accepting that personal jurisdiction can be exercised based on a conspiracy theory, but finding that the plaintiffs failed to present specific facts as to where the alleged conspiracy took place).

**B.     The Federal Claim**

The complaint includes as its second count a claim against the individual defendants brought under the Civil Rights Act of 1964, 42 U.S.C. § 1983.  The plaintiffs allege a violation of "substantive due process."  They maintain that a constitutional claim exists based on allegations of abuse of process or wrongful commencement of civil proceedings.  (Compl. ¶ 62.) I set out the material allegations for ease of reference:

> 62.    The behavior by Defendants, including but not limited to intentionally propounding false statements about Plaintiffs in order to secure an ex parte attachment and intentionally bringing suit against Plaintiffs who had no material connection to the CUTPA action upon which the ex parte attachment was falsely based, and by then intentionally using the wrongfully obtained attachment and liens in order to improperly leverage and pressure an unfair and unreasonable resolution of the CUTPA action, and by intentionally harming Plaintiffs credit and property interests in Maine when Plaintiffs had no interest in Valerie Hoffman's businesses and Plaintiffs were not and have never been the subject of any Connecticut regulatory investigation, all were acts or omissions that are arbitrary and capricious, run counter to the concept of ordered liberty, and are violative of universal standards of decency, egregiously unacceptable, outrageous, and conscience-shocking.

The defendants contend that absolute immunity applies to this kind of claim rather than qualified immunity.  (Mot. to Dismiss at 9-12.)  They otherwise argue that qualified immunity exists, in any event, because the plaintiffs fail to allege a constitutional deprivation and because no

reasonable official acting on the information available to them would have thought that the request for an *ex parte* attachment would result in a due process violation.  (Id. at 12-14.)  I conclude that absolute immunity does not apply across the board, but rather restricts the extent of the plaintiffs' claim.  To the extent to which there is a claim subject to only qualified immunity, I conclude that the plaintiffs have failed to allege a violation of a substantive due process right.

### 1.    *Absolute immunity versus qualified immunity*

The solitary federal claim in this case asserts a violation of substantive due process.  The defendants argue that the claim must be dismissed because federal law extends absolute immunity from suit to government entities and their agents when the challenged conduct consists of the performance of prosecutorial functions, including a decision to pursue administrative enforcement proceedings.  (Mot. to Dismiss at 9-14.)  The defendants contend that this immunity extends to the decision to pursue litigation (id. at 10-11) and to the introduction of a sworn statement in the course of proceedings (id. at 12).  As a fall back, the individual defendants raise qualified immunity on the ground that no reasonable official could have foreseen a constitutional claim arising from efforts to set aside a transfer from Valerie Hoffman to Peaceful Properties, recorded only days after commencement of the Connecticut unfair trade practices action.  (Id. at 12-14.)  The plaintiffs respond that this is not an immunity scenario because it is not merely about the decision to commence proceedings, but about the use of a knowingly false affidavit. The plaintiffs otherwise argue that absolute immunity cannot exist because the defendants were not engaged in advocacy, but were more like complaining witnesses.  (Opposition Mem. at 14-15.)

"The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."  Burns v. Reed, 500 U.S. 478, 486 (1991).  "The

13

presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties."  Id. at 486-87.  State attorneys general, as legal advocates of the states they work for, are absolutely immune against suits for money damages under § 1983 for conduct that is "intimately associated with the judicial phase of the criminal process," Imbler v. Pachtman, 424 U.S. 409, 430 (1976), or the civil process, Smith v. Power, 346 F.3d 740, 742 (7th Cir. 2003) (involving city attorney's commencement of civil proceedings for demolition of a building).[5]

In Butz v. Economou, the Supreme Court held that "there are some officials whose special functions require a full exemption from liability."  438 U.S. 478, 508 (1978).  Among them are government officers who institute or engage in judicial proceedings on behalf of their governmental employer.  Id. at 511-12.  Also falling into this category are witnesses in judicial proceedings.  Id. at 512;  Briscoe v. LaHue, 460 U.S. 325, 342-43 (1983) (recognizing absolute immunity for governmental witnesses, including police officers, who are sued under § 1983 on account of testimony provided as a witness during judicial proceedings).

---

[5]     See also Cooper v. Parrish, 203 F.3d 937, 947 (6th Cir. 2000) ("We agree that the prosecutors in this case may still be absolutely immune even though the alleged constitutional violations occurred when the officials were pursuing a civil action.  Indeed, as long as the prosecutors were functioning in an enforcement role and acting as advocates for the state in initiating and prosecuting judicial proceedings, they are entitled to an absolute immunity defense.");  Schrob v. Catterson, 948 F.2d 1402, 1411 (3d Cir. 1991) (holding that prosecutor's initiation of an *in rem* civil proceeding for the forfeiture of criminal property was protected by absolute immunity, which "is extended to officials when their duties are functionally analogous to those of a prosecutor's, regardless of whether those duties are performed in the course of a civil or criminal action");  Pfeiffer v. Hartford Fire Ins. Co., 929 F.2d 1484, 1489-90 (10th Cir. 1991) (describing as "well established" that "absolute prosecutorial immunity extends to state attorneys and agency officials who perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings");  cf. Butz v. Economou, 438 U.S. 478, 515-16 (1978) (extending absolute immunity to federal agency attorneys who instituted administrative proceedings);  Light v. Haws, 472 F.3d 74, 79 (3d Cir. 2007) (recognizing that conduct of assistant counsel for the Pennsylvania DEP "in bringing . . . civil petitions against [the plaintiff] are precisely the type of actions that absolute immunity is designed to protect" but remanding for district court to sort out the nature of the claims);  Barrett v. United States, 798 F.2d 565, 572 (2d Cir. 1986) (extending the rationale of Butz to afford immunity for "the government attorney's initiation of civil litigation in a state or federal court").

The defendants argue that the claims the plaintiffs have conceived of are premised on the exercise of prosecutorial functions and/or witness functions for which absolute immunity exists. (Mot. to Dismiss at 11-12.)  The plaintiffs respond that this case is different because the presentation of the Fitzsimmons affidavit in support of an *ex parte* attachment put Fitzsimmons in the role of complaining witness rather than advocate, prosecutor, or proper litigation witness. As I indicated in the discussion of personal jurisdiction, the plaintiffs attempt to extend the claim to the other individual defendants with a conspiracy theory.  (Opposition Mem. at 13-14.)  The authority they cite, Kalina v. Fletcher, 522 U.S. 118 (1997), supports only their contention that absolute immunity does not exist for a government official who takes on the role of complaining witness.  In Kalina, the Supreme Court considered whether absolute immunity extends to a state prosecutor who offered her own sworn statements to support an application for an arrest warrant, something she did in order to commence a criminal proceeding.  Id. at 120.  The Supreme Court held that absolute immunity was not available to the extent the prosecutor performed a complaining witness function ordinarily performed by an investigating officer,[6] a function that was not necessary to her performance of the prosecutorial function in the context of judicial proceedings and for which any other law enforcement officer would have only qualified immunity.  Id. at 127-129.  To the extent that the prosecutor went beyond the traditional functions of an advocate, she was shielded only by qualified immunity.  Id. at 131.

In opposition to the motion to dismiss, the plaintiffs tether their claim to the Fitzsimmons affidavit that was submitted in support of the *ex parte* attachment motion.  (Opposition Mem. at 14-15.)  Accordingly, I treat the degree of immunity as qualified rather than absolute.  I do so

---

[6]  At common law, complaining witnesses were not immunized from liability for providing false testimony. In particular, the tort of abuse of process/malicious prosecution was, and still is, available to provide a remedy for malicious actions that terminate in favor of the defendant.  Kalina, 522 U.S. at 127; see also id. at 132 (Scalia, J., concurring).

because of the parallels between the presentation of an *ex parte* attachment motion in civil proceedings and the presentation of an *ex parte* application for an arrest warrant in criminal proceedings.  The Supreme Court has recognized that private parties who engage in similar tactics would not be immune at common law against a claim of malicious prosecution or abuse of process, and that, therefore, the immunity available under federal law should not be absolute. Wyatt v. Cole, 504 U.S. 158, 164 (1992).  Immunity for state actors sued under § 1983 is supposed to correlate with the common law and the Supreme Court has asserted that a private witness would be subject to suit on similar facts.  Wyatt, 504 U.S. at 164-65;  Todd, 434 F.3d at 444-45.  Based on these precedents, it is my recommendation that the Court not apply absolute immunity across the board in this case.

### 2. *The substantive due process claim*

The federal claim asserts a violation of substantive due process.  There were originally four defendants on this claim:  the Commissioner of the Connecticut Department of Consumer Protection, Jerry Farrell, Jr., and three Assistant Attorneys General of the Connecticut Office of the Attorney General, Matthew Fitzsimmons, Jose Rene Martinez, and Phillip Rosario.  All of them were sued in their official and individual capacities.  (Verified Compl. ¶ 50.)  The verified complaint reflects that the State of Connecticut, on February 21, 2007, filed an unfair trade practices action against Valerie Hoffman and her companies.  (Id. ¶ 30.)  The deed of transfer from Valerie Hoffman to Peaceful Properties was recorded six days later.  (Id. ¶ 29.) Subsequently, the State of Connecticut filed a fraudulent transfer action in Maine to set the transfer aside.  (Id. ¶ 32.)  In connection with that litigation, AAG Fitzsimmons executed an affidavit, in support of an *ex parte* attachment motion.  According to the verified complaint, the attachment was sought in an amount exceeding $1.5 million, a figure that is, allegedly, entirely

16

out of proportion to any reasonable assessment of the value of Connecticut's claim in the litigation.[7]  (Id.)  Additionally, the Fitzsimmons affidavit represented that the property was transferred after the commencement of the unfair trade practices action and that the house was constructed already, though Fitzsimmons allegedly knew that the deed of transfer was executed on an earlier date and that the house was not near completion.  (Id. ¶¶ 33-35.)  The attachment remained in place for approximately four months before being lifted on a motion filed by Hoffman and Peaceful Properties.  (Id. ¶¶ 38, 52.)  During that time, Connecticut's counsel filed a *lis pendens* against the property in the Hancock County Registry of Deeds.  (Id. ¶ 40.)  The plaintiffs' lender suspended a construction loan agreement due to the attachment and lien.  (Id. ¶ 43-44.)

The defendants argue that the complaint fails to contain a cognizable substantive due process claim and that, even if it does state a claim, qualified immunity applies.  They argue that no reasonable state official would have thought that seeking an *ex parte* attachment could give rise to a substantive due process violation.  (Mot. to Dismiss at 12-14, 16-18.)  The plaintiffs respond that the defendants "abused their positions [by] fabricating evidence that Plaintiffs were involved in a fraudulent transfer" and then "used that evidence to initiate a proceeding . . . for an attachment" in an amount well beyond any reasonable measure.  (Opposition Mem. at 20.)  The plaintiffs also complain of the filing of a *lis pendens* in the registry.  (Id.)  They liken their cause to that of the plaintiff in Limone v. Condon, where the First Circuit observed that the deliberate fabrication of evidence to frame individuals for serious crimes, "under color of official sanction," necessarily violates due process.  372 F.3d 39, 44-45 (1st Cir. 2004).  They identify both a

---

[7]       Among other remedies, the Uniform Fraudulent Transfer Act enables a creditor to avoid a transfer "to the extent necessary to satisfy the creditor's claim."  14 M.R.S. § 3578(1)(A).  See also id. § 3579(2).

property interest and a liberty interest because the encumbrance of the property disrupted their relationship with a creditor, which frustrated Hoffman's exercise of his trade.   (Opposition Mem. at 21-22.)  I by no means disregard the significance of a deprivation that interferes with one's livelihood.  Nevertheless, I conclude that the plaintiffs' constitutional theory is not actionable and must be dismissed.  I recite the dismissal standard and the qualified immunity standard before explaining my conclusion.

> ### *a.*      *The dismissal standard*

A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint, whether the claims, as alleged, are sufficient "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The plaintiff is not required to prove her allegations in order to overcome the motion.  The question is simply whether the factual allegations, taken as true, are enough to "establish a 'claim to relief that is plausible on its face.'"  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Plausibility, rather than possibility, is the benchmark.  Rule 8 of the Federal Rules of Civil Procedure requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  The Rule condones "notice" pleading, a form of pleading that is minimally sufficient to give the defendant fair notice of the grounds for the claim.  Twombly, 550 U.S. at 555.  The Rule also permits allegations related to the defendant's mental state to be alleged "generally."  Fed. R. Civ. P. 9(b).  Yet, while a complaint need not contain detailed factual allegations, the plaintiff cannot rely entirely on "a formulaic recitation of the elements of a cause of action," id., "an unadorned, the-defendant-unlawfully-harmed-me accusation," Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), or similarly bald assertions.  In this case, the allegation that is subject to analysis is the contention that the

defendants' alleged actions and omissions have been "arbitrary and capricious, run counter to the concept of ordered liberty, and are violative of universal standards of decency, egregiously unacceptable, outrageous, and conscience-shocking."  (Verified Compl. ¶ 62.)

       *b.*       *Qualified immunity*

The Supreme Court's opinions "consistently have held that government officials are entitled to some form of immunity from suits for damages.  As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "In the last analysis, . . . qualified immunity purposes to protect government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct."  Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999).  In this way, the doctrine of qualified immunity protects a state actor from litigation in circumstances where the proper application of the underlying constitutional standard is unclear and, therefore, not otherwise suited for dismissal or summary disposition.  The doctrine "leaves 'ample room for mistaken judgments' and protects 'all but the plainly incompetent or those who knowingly violate [federal] law.'"  Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  The availability of qualified immunity turns on two considerations:  "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009).  The second aspect of this test "focuses . . . on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."  Maldonado v.

Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  "[T]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (*per curiam*) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

       c.       *§ 1983 and substantive due process*

Section 1983 of the Civil Rights Act confers upon every United States citizen a right to redress against any person who, acting under color of state law, causes a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  A section 1983 claim does not lie absent state action.  Alexis v. McDonald's Rest., 67 F.3d 341, 351 (1st Cir. 1995).  A claim that agents of state government abused their power will rise to the level of a substantive due process violation (as distinct from a procedural due process claim or a claim premised on another constitutional prohibition, such as the Fourth Amendment's prohibition against unreasonable seizures) only when the conduct in question "is so extreme and egregious as to shock the contemporary conscience."  DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005).  Conscience-shocking conduct is an indispensable element of the claim and without it a "substantive" due process claim will not be actionable even if there may have been a violation of an otherwise identifiable constitutional right.  Id.

> As distinguished from its procedural cousin, . . . a substantive due process inquiry focuses on "what" the government has done, as opposed to "how and when" the government did it.  And although the yardstick against which substantive due process violations are measured has been characterized in various ways, . . . before a constitutional infringement occurs, state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking.

Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990).  The conscience-shocking concept lies "at the ends of the tort law's spectrum of culpability," County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998), so that negligence, carelessness, oversight, failure to investigate, and similar

exercises in inadequacy are "categorically insufficient."  DePoutot, 424 F.3d at 119.  What is

necessary is "conduct intended to injure in some way unjustifiable by any government interest."

Lewis, 523 U.S. at 849 (emphasis added).  "Mere violations of state law, even violations

resulting from bad faith, do not necessarily amount to unconstitutional deprivations of

substantive due process."  DePoutot, 424 F.3d at 119.

The constitutional claim in this case involves allegations of intentional manipulation of

civil process in connection with an action to set aside a fraudulent transfer, in order to attach and

otherwise tie down the piece of real property that is the subject of the fraudulent transfer action.

Maine law allows for *ex parte* attachment upon specified conditions, requires judicial approval of

a motion for *ex parte* attachment, and prescribes a procedure designed to afford a reasonably

prompt hearing to a party impacted by an *ex parte* attachment order.  Me. R. Civ. P. 4A(g).

Without question, abuse of this process can result in significant economic harm, both to property

and to one's occupation or trade, though not unlike the harm that can arise from the entire

panoply of tortious conduct that Maine common law prescribes remedies for.  But whether the

act is cast as an abuse of process, wrongful use of civil proceedings, a tortious misrepresentation

of fact, or a tortious interference with an economic relationship, there is nothing inherently

*shocking* or *egregious* about the effort that would justify recognition of a constitutional tort claim

sounding in substantive due process, even if the interests interfered with can be described as

"fundamental" in constitutional parlance.  Additionally, even if it is assumed that a claim is

stated, it is not clearly established such that a reasonable person, even one trained in the law,

would recognize that the Maine Superior Court's decision to grant the *ex parte* motion for

attachment would trigger a constitutional violation where a state rule of procedure is in place to

prevent a prolonged deprivation without notice and a hearing and where a state tort remedy for

wrongful use of civil proceedings or abuse of process (discussed below) holds out the prospect of a remedy.  Consequently, even assuming that a substantive due process claim is stated in the complaint, it is one to which the sole individual defendant over whom there is personal jurisdiction is qualifiedly immune.

With regard to the "shocking" standard, a comparison with Limone v. Condon may prove instructive.  There, the First Circuit considered whether qualified immunity could shield federal and state agents against claims that they framed the plaintiffs on charges of murder.  Limone, 372 F.3d at 42-44.  In DePoutot, the Court described Limone as involving "the intentional framing of innocent citizens for *serious crimes* they did not commit."  DePoutot, 424 F.3d at 119 (emphasis added).  This took place in the context of a criminal process in which the defendants allegedly suppressed exculpatory evidence, knowing who the actual murderer was.  Limone, 372 F.3d at 44.  Juicing up an affidavit in support of an *ex parte* attachment pales in comparison.  The deprivation that arises on account of an *ex parte* attachment is subject to challenge, normally on an accelerated schedule, and an attachment can be dissolved, modified or discharged by presentation of a bond or other suitable collateral.[8]  Me. R. Civ. P. 4A(h).  In addition to these considerations related to the relative severity of the conduct in question, it cannot be said that no legitimate governmental objective informed the action to set the transfer aside.  The deed of transfer from Valerie Hoffman to Peaceful Properties was recorded six days after the commencement of Connecticut proceedings against Valerie Hoffman.  In effect, the complaint itself tends to discourage any inference that the defendants are engaged in some personal

---

[8]    The filing of a *lis pendens* certificate, 14 M.R.S. § 4455(2), would just as likely frustrate potential sales of the property as well as the plaintiffs' relationship with their creditor.  Yet, the filing of the certificate certainly does not shock the conscience.  Like Connecticut's decision to commence the fraudulent transfer proceedings, which decision is subject to absolute immunity, the decision to file the certificate appears to be a natural consequence of the plaintiffs' decision to record the deed.

campaign to injure the plaintiffs in the absence of any legitimate government interest.  Lewis,
523 U.S. at 849.  These factors point away from the degree of offensiveness required to support a
substantive due process claim.

Even assuming that the presentation of allegedly intentional or reckless falsehoods should
be regarded as conscience-shocking behavior, the precedents the plaintiffs rely on involve the
alleged abuse of criminal process leading to a claim under the Fourth Amendment, Kalina, 522
U.S. at129, or else an abuse of the criminal evidentiary record that results in the outrage of being
framed for murder, Limone, 372 F.3d at 43-44.  The plaintiffs have not cited any precedent
involving a substantive due process claim premised on the presentation of false evidence in a
civil context that works a temporary deprivation of an interest in property or a liberty interest
associated with the pursuit of a trade connected with the property.  Nor have they identified a
case in which a substantive due process claim arose from a state actor's litigation conduct in the
courts of another state.  What limited authority I have been able to locate supports the application
of the qualified immunity defense because it tends to demonstrate that the viability of a
substantive due process theory is not clearly established, Smith v. Mass. Dep't of Corr., 936 F.2d
1390, 1402 (1st Cir. 1991) (construing a § 1983 malicious prosecution claim as a procedural due
process claim and withholding federal remedy where a state remedy was available), especially
when the deprivation stems from interference with property rights through civil process.  I do not
mean to state that this is necessarily a Fourth Amendment case, as was the situation in Albright
v. Oliver, 510 U.S. 266, 271-72 (1994) (withholding substantive due process protection where
the claim was based on prosecution in the absence of probable cause).  However, even if it is a
due process claim, a postdeprivation state tort remedy ordinarily is the answer for unauthorized
acts undertaken by a state actor that could not be preceded by a hearing or other predeprivation

process.  Lowe v. Scott, 959 F.2d 323, 340 (1st Cir. 1992) ("When a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, . . . the [Supreme] Court has repeatedly emphasized that the due process inquiry is limited to the issue of the adequacy of postdeprivation remedies provided by the state.") (alteration in original).  In this case state law provides postdeprivation remedies.  I turn to the issue of state law remedies now.

## C.      State Law Claims

The plaintiffs allege a collection of common law tort claims:  slander of title, abuse of process, wrongful use of civil proceedings, intentional infliction of emotional distress, defamation, and tortious interference with an advantageous economic relationship.  The Court has original jurisdiction over these claim based on the parties' diverse citizenship.[9]  The defendants argue that the claims can only be asserted against the State of Connecticut because the fraudulent transfer action was brought by Connecticut.  (Mot. to Dismiss at 18.)  They also argue that sovereign immunity completely precludes the action.  (Id. at 7-9.)  Finally, the defendants challenge whether each claim is properly stated in the complaint, arguing in the process that Connecticut law applies rather than Maine law, and advancing common law privileges and a contention that the slander of title claim is a compulsory counterclaim to the fraudulent transfer action.  (Id. at 14, 18-26.)  I address each challenge in turn, but I reserve the comity sovereign immunity question for last.

### 1.      Applicable law

As a preliminary matter, the defendants argue that the Court should apply Connecticut law to determine the elements of the causes of action because, in their view, all of the relevant

---

[9]      Hoffman maintains he is a resident of Maine (Hoffman Aff., Doc. No. 16-2) and that Peaceful Properties is a Maine limited liability company in good standing and whose sole member is David Hoffman.  Although defendants characterize the action as one brought by "non-Maine citizens" (Mot. to Dismiss at 1), they do not mount any affidavit-based challenge to the assertions of residency.

conduct occurred in Connecticut and this litigation occurs in connection with proceedings in Connecticut.  (Id. at 14-15.)  I conclude that Maine law applies.

This Court applies Maine choice of law principles.  Walker v. Unum Life Ins. Co. of Am., 530 F. Supp. 2d 351, 353 (D. Me. 2008).  "The State of Maine follows the Restatement (Second) of Conflicts of Laws and the 'most significant contacts and relationships' approach in determining choice of law."  Id.  The principles that apply are the following:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6 (1971).  In this case the plaintiffs are suing the State of Connecticut and its agent Fitzsimmons in Maine, seeking money damages for harms felt in Maine that arise from tortious acts allegedly committed in Maine.  Contrary to the defendants' assertion that this case is about the litigation occurring in Connecticut, this litigation is actually about the fraudulent transfer litigation instituted in Maine and related statements both in the litigation and outside of it.  Consequently, I do not believe there is any reasonable basis for application of Connecticut law.  Conflict of laws principles (b) and (e) obviously predominate in the context of this civil action and they both clearly point to Maine.  For instance, Maine is the state with the most obvious and direct concern over injuries occurring in Maine arising from the

alleged wrongful use of Maine civil proceedings or abuse of Maine civil process.  I apply Maine law.

> ### 2.   *Absolute common law privilege for the commencement of civil proceedings, relevant statements offered in the course of such proceedings, for the giving of relevant witness testimony, and for the pursuit of preliminary remedies and the filing of related public notices*

In the course of their discussion of immunity law, the defendants assert that no action can be maintained against them that arises out of Fitzsimmons' presentation of testimony as a witness.  This is an invocation of a common law privilege rather than a doctrine of sovereign immunity.  Maine courts extend an absolute privilege to parties and witnesses for relevant communications and testimony made preliminary to and in the course of litigation.  Dineen v. Daughan, 381 A.2d 663, 664 (1978);  Restatement (Second) of Torts §§ 587 (parties) & 588 (witnesses) (1977).  "[P]ublic policy requires that witnesses shall not be restrained by the fear of being vexed by actions at the instance of those who are dissatisfied with their testimony." Dineen, 381 A.2d at 664 (quoting Garing v. Fraser, 76 Me. 37, 42 (1884)).  "A witness is absolutely privileged to publish false and defamatory matter of another in communications *preliminary to* a proposed judicial proceeding *and as a part of* a judicial proceeding in which he is testifying, if it has some relation thereto."  Dunbar v. Greenlaw, 152 Me. 270, 277, 128 A.2d 218, 223 (1957) (emphasis added) (quoting Restatement of the Law, Torts, § 588). "[A]llegations made in pleadings are [also] absolutely privileged."  Id.  See also Dineen, 381 A.2d at 665 (applying absolute privilege to statement in motion for return of improperly attached goods);  Hawkins v. Kiely, No. 08-139-P-S, 2008 U.S. Dist. Lexis 67362, *25, 2008 WL 4104486, *7 (Aug. 31, 2008), aff'd, 2008 U.S. Dist. Lexis 82590, 2008 WL 4542965 (D. Me. Oct. 9, 2008) (dismissing claims of defamation and false light publication that were based on

statements contained in an affidavit filed in bankruptcy proceedings); Street & Co. v. Carr, No. CV-91-1537, 1992 Me. Super. Lexis 173, *7-*8 (Me. Super. Ct., Cum. Cty., July 15, 1992) (applying absolute privilege to statements in *lis pendens* notice related to a judicial proceeding). The absolute privilege in question applies so long as the offensive content of the testimony or pleadings in question is relevant to the proceedings. Dineen, 381 A.2d at 665; Dunbar v. Greenlaw, 152 Me. 270, 277, 128 A.2d 218, 222-23 (1956).

Fitzsimmons and the State of Connecticut would have an absolute privilege shielding them from liability if the plaintiffs sought to premise tort claims exclusively on the content of the pleadings, the *ex parte* motion, the *lis pendens*, and the affidavit filed in the Superior Court because the contents were relevant to a judicial proceeding. This privilege is not limited to the claim for defamation. The privilege has origins in the law of libel and slander, but it has been expanded to other torts. See Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP, 175 F.3d 14, 17-18 (1st Cir. 1999) (discussing New Hampshire and Massachusetts law and dismissing claim of malpractice in addition to a defamation claim); Hurley v. Towne, 156 A.2d 377, 379, 155 Me. 433, 436 (1959) (applying the privilege to a claim of false imprisonment); Heavrin v. Nelson, 384 F.3d 199, 202 n.2 (6th Cir. 2004) (applying Kentucky law and applying privilege to claim of fraud); Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Ins. Co., 639 So.2d 606 (Fla. 1994) (tortious interference); Wendy's of S. Jersey, Inc. v. Blanchard Mgmt. Corp., 406 A.2d 1337, 1340 (N.J. Super. Ct. 1979) (slander of title based on filing of notice of *lis pendens*); Panitz v. Behrend, 632 A.2d 562, 564 (Pa. Super. Ct. 1993) ("all tort actions based on statements made during judicial proceedings"); Kachig v. Boothe, 99 Cal. Rptr. 393, 403 (Cal. Ct. App. 1971) (intentional infliction of emotional distress). The privilege has even been extended to claims of malicious prosecution, McClarty v. Bickel, 159 S.W. 783,

784 (Ky. 1913), but the general rule appears to be that the privilege does not reach claims based

on the witness's role in initiating failed proceedings.  Enlow v. Tishomingo County, 962 F.2d

501, 511 (5th Cir. 1992);  DeLaurentis v. New Haven, 597 A.2d 807, 826 (Conn. 1991);  Palmer

v. Zaklama, 1Cal. Rptr. 3d 116, 124 (Cal. Ct. App. 2003) (citing Albertson v. Raboff, 295 P.2d

405, 408 (Cal. 1956)).

Despite this authority, this case includes allegations of unprivileged statements to third

parties outside the bounds of the litigation.  For example, at paragraphs 82 and 83 the plaintiffs

complain that the defendants published statements "orally and in writing, including but not

limited to, on information and belief, individuals at Bar Harbor Bank & Trust, business

associates of Plaintiffs and other members of the community," indicating that the plaintiffs had

engaged in a fraudulent transfer.  These allegations fall outside of the protective aura of the

common law privileges because they are extrajudicial in nature and, if supported by discovery,

would cause the privilege to be lost.  Vahlsing Christina Corp. v. Stanley, 487 A.2d 264, 267

(1985) (observing that privilege may be lost by publication beyond the privileged

circumstances).[10]

### 3.    *The Rule 12(b)(6) Challenges*

For a statement of the standard that governs the Rule 12(b)(6) challenges, see, *supra*,

section B.2.a of this discussion.  I address the several claims out of order so that the wrongful use

---

[10]    The defendants object that allegations based on information and belief, even though attested to in a verified complaint, cannot be considered for purposes of the *prima facie* personal jurisdiction analysis (Reply Mem. at 5 n.5).  I have accepted this position for purposes of the personal jurisdiction analysis, see Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005) (requiring "properly supported proffers of evidence"); cf. Fed. R. Civ. P. 56(e)(1) (requiring affidavits based on personal knowledge and demonstrating competence to testify to the fact at issue), but these allegations can inform the Rule 12(b)(6) contest.

of civil proceedings and the abuse of process claims can be considered together after the other claims are discussed.

> a.      Slander of title (count I)

The slander of title claim exists where there has been a publication of a false and slanderous statement disparaging a claimant's title to an interest in land, the statement was made with malice or with reckless disregard for its falsity, and the statement causes actual damages. Pettee v. Young, 2001 ME 156, ¶ 20, 783 A.2d 637, 642.  The party whose title is challenged is Peaceful Properties.  The defendants argue that this claim is a compulsory counterclaim that had to be asserted in answer to their fraudulent transfer action, citing Rule 13(a). (Mot. to Dismiss at 19.)  They state that the fraudulent transfer action "is the proceeding that will ultimately determine whether the alleged slander of title by the defendants is actionable or not."  (Id.)  The plaintiffs respond that their action does not arise out of the same transaction or occurrence as the fraudulent transfer action because their claim arises (in part) out of the defendants' decision to initiate the fraudulent transfer action, rather than any transaction or occurrence underlying that action.  (Opposition Mem. at 23-24.)  They cite the Maine Civil Practice manual for the proposition that "counterclaims for damages or other relief arising out of the act of the plaintiff in suing have been held premature."  (Id. at 24, citing 1 Field, McKusick & Wroth, Maine Civil Practice § 13.2 n.9 at 268 (2d ed. 1970).)  I agree with the defendants that when it comes to a slander of title claim and a fraudulent transfer claim the former is a compulsory counterclaim to the latter.  This conclusion is supported by Efstathious v. Aspinquid, 2008 ME 145, ¶¶ 25-29, 956 A.2d 110, 118-19, where the Law Court held that a slander of title claim was a compulsory

counterclaim to a claim to quiet title.  Because Peaceful Properties[11] failed to interpose the compulsory counterclaim for slander of title in the fraudulent transfer action, it is precluded from asserting that claim in a separate action as a matter of Maine law.  Id.

> **b.**     Intentional Infliction of Emotional Distress (count V)

A claim for intentional infliction of emotional distress exists where the defendant has engaged in intentional or reckless conduct designed to cause emotional distress to the plaintiff and the plaintiff has suffered severe emotional distress that no ordinary person could reasonably endure, provided that the conduct in question was "extreme and outrageous," exceeding "all possible bounds of decency," and "utterly intolerable in a civilized community."  Curtis v. Porter, 2001 ME 158, ¶ 10, 784 A.2d 18, 22-23.  The complaint alleges that David Hoffman experienced extreme emotional upset based on the defendants' commencement of the fraudulent transfer action,  false representations to the court in relation to the *ex parte* attachment motion, and the disruption of his credit and enjoyment of his property as a consequence.  (Verified Compl. ¶ 77.) The defendants argue that "the assertion of a legal right by a claimant in litigation does not satisfy the elements of the tort, even if its assertion is distressing to the claimant."  (Mot. to Dismiss at 22-23 (citing Restatement (Second) of Torts § 46 cmt. g (1965).)  The plaintiffs respond that the "essence" of their claim is that the defendants "had no legal right to seek an *ex parte* attachment, because the Restatement includes language to the effect that one must "insist upon his legal rights in a permissible way."  (Opposition Mem. at 27, quoting the same comment.)  The Law Court has held that it is "not prepared to recognize that the tort of intentional infliction of emotional distress is available to a party outraged by the filing of a

---

[11]     The parties have not addressed whether both of the plaintiffs can pursue this claim concerning the title that Peaceful Properties claims in the property.

lawsuit against it."  David v. Currier, 1997 ME 199, ¶ 6, 704 A.2d 1207, 1209.  That rationale

logically extends to an effort to obtain an attachment in conjunction with the commencement of a

civil action.

> c.     Defamation (count VI)

Defamation consists of unprivileged publication of a false and defamatory statement

concerning another, under conditions demonstrating at least negligence on the publisher's part,

where the statement is either actionable *per se* or results in special harm to the plaintiff.  Cole v.

Chandler, 2000 ME 14, ¶ 5, 752 A.2d 1189, 1193.  It is chiefly with this claim that the

defendants brief the absolute privileges already discussed in section C.2.  I agree with the

defendants that the common law privileges, if they are not lost as a consequence of defamatory

publication to third parties, would justify dismissal of the defamation claim.  Nevertheless, the

plaintiffs allege statements made to third parties such as Bar Harbor Bank & Trust.  Because the

complaint includes allegations of defamatory publication outside of the ordinary channels for

making privileged statements incident to litigation, the privilege cannot be applied at the

pleading stage.  Vahlsing Christina Corp., 487 A.2d at 267 (observing that the privilege may be

lost by publication beyond the privileged circumstances).  It is not clear to me based on a review

of the complaint that the communications with third parties were necessarily unrelated to the

litigation and did not arise, for example, as a consequence of the filing of the *lis pendens*

certificate.  If the alleged communications with third parties merely consist of the defendants' use

of the attachment or their filing of the *lis pendens*, then such publications would be caught up in

the absolute privilege.  See Pond Place Partners, Inc. v. Poole, 567 S.E.2d 881, 893-95 (S.C.

2002) (collecting and discussing cases involving notice to third parties stemming from

recordation of legal notices).  However, at this point I cannot say that the complaint fails to

include allegations of plausible, defamatory communications to third parties outside of the scope of the absolute privilege.

    d.      Tortious interference (count VII)

A claim of tortious interference exists where the plaintiff has a valid contract or "prospective economic advantage" that the defendant has interfered with through an act of fraud or intimidation, thereby causing damages.  Currie v. Indus. Sec., Inc., 2007 ME 12, ¶ 31, 915 A.2d 400, 408.  The defendants dispute whether the complaint includes adequate allegations of fraud and reliance on the part of the plaintiffs.  (Mot. to Dismiss at 26.)  These arguments do not merit prolonged discussion.  The existence of false statements is taken as true for purposes of the motion and the defendants fail to demonstrate that reliance on the part of the plaintiff, as opposed to the plaintiff's creditor, is essential to the claim.[12]

    e.      Abuse of process and wrongful use of civil proceedings

In counts III and IV the plaintiffs allege abuse of process and wrongful use of civil proceedings, respectively.  These claims focus on the initiation of *ex parte* attachment proceedings and the contention is that the defendants sought the *ex parte* attachment in the absence of any valid basis for doing so and filed their ill-gotten attachment with the improper ulterior motive of forcing Valerie Hoffman to settle or cooperate with regard to the Connecticut unfair trade practices matter.  (Verified Compl. ¶¶ 66, 70-72.)  The defendants argue that the

---

[12]      Unlike the defamation claim, which is based in part on communications to third parties outside the scope of judicial proceedings, the tortious interference claim is premised squarely on the defendants' acquisition and assertion of a lien, coupled with their filing of a *lis pendens* certificate.  Again, there is persuasive authority for the proposition that a tort action cannot be maintained based on a party's communications to third parties *via* legal notices.  See Pond Place Partners, 567 S.E.2d at 893-95;  Wendy's of S. Jersey, Inc., 406 A.2d at 1340.  However, this privilege is an outgrowth of the common law of defamation and, in Maine, the privilege is lost if the statements are made outside the scope of the privilege.  Thus, if plaintiffs present actual evidence that Fitzsimmons or some other agent of the State of Connecticut made defamatory statements outside of the legal proceeding, either defendant could theoretically lose the privilege that attaches to legal pleadings, witness testimony, and notices and thus become liable for not only defamation but also for the tortious interference claim.

abuse of process claim cannot persist unless it could be said that they used the attachment process to accomplish a purpose other than securing an asset, which, of course, is exactly the purpose of the attachment process.  (Mot. to Dismiss at 20.)  As for wrongful use of civil proceedings, in particular, the defendants argue that the claim is premature because the plaintiffs have not achieved a favorable outcome in the fraudulent transfer action.  (Id. at 21.)

To properly allege a claim for wrongful use of civil proceedings, "a plaintiff must allege that an action was instituted against him without probable cause and with a primary purpose other than that of securing the proper adjudication of the claim upon which the proceedings were based and that he received a favorable termination of the proceedings."  Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell, 1998 ME 70, ¶ 6, 708 A.2d 283, 286.  "Favorable termination of the offending proceeding is an essential element of the claim."  Pepperell Trust Co. v. Mountain Heir Fin. Corp., 1998 ME 46, ¶ 18, 708 A.2d 651, 656.

As for abuse of process, that claim consists of "use of process in a manner improper in the regular conduct of the proceeding and the existence of an ulterior motive."  Id., 1998 ME 70, ¶ 7, 708 A.2d at 286.  As compared to the wrongful use claim, "which lies where there is no basis for an entire claim," abuse of process involves abuse of legal process in the course of an otherwise properly filed action, such as writs of attachment and subpoenas.  Id., 1998 ME 70, ¶ 16, 708 A.2d at 655 n.8.  See also Simon v. Navon, 71 F.3d 9, 15 (1st Cir. 1995) (discussing the confusing relationship between malicious prosecution/wrongful commencement claims and abuse of process claims).  To abuse the process in question, the person instituting the process must use it "primarily to accomplish a purpose for which it is not designed."  Restatement (Second) of Torts § 682 (1977).  "The usual case of abuse of process is one of some form of

extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it."  Id.

The Law Court has discussed the distinction between the two tort claims as being that the former (wrongful use) involves use of process for the purpose the process is intended for, only without "probable cause" to do so, whereas the latter (abuse) involves employment of process for a purpose not contemplated by law.  Saliem v. Glovsky, 132 Me. 402, 405, 172 A. 4, 6 (Me. 1934).  The proper manner of parsing the plaintiffs' allegations in this action is not clear.  The claim turns on allegations that false statements were made in order to secure an attachment through *ex parte* process that should not have been issued.  The use of an allegedly false affidavit to secure an attachment seems to relate to the question of whether proper cause exists, both for pursuit of the writ and for pursuit of the underlying claim.  This suggests that the claim belongs in the wrongful use category, a category to which the Superior Court has previously relegated such a claim.  See Ins. Mgmt. Corp. v. Tri-County Ins. Agency, No. CV-85-811, 1985 Me. Super. Lexis 330 (Me. Super. Ct., Cum. Cty., Nov. 13, 1985) (characterizing a similar claim as a "subspecies of malicious prosecution" and dismissing it based on the fact that the related proceedings were not yet resolved).  On the other hand, "obtaining a writ of attachment or a trustee summons by false or misleading affidavit is an imposition upon the integrity of the judicial process," and another Superior Court Justice has ruled that "the use of a process so obtained can be properly characterized as 'abuse of process' and this in spite of the summary safeguards provided under the rule for the discharge or modification of such attachments." Dineen v. Pelletier, No. CV-76/343, 1977 Me. Super. Lexis 2, *33-*34 (Me. Super. Ct., York Cty., Aug. 25, 1977).

However courts might distinguish the nature of the two claims, the most salient question is whether the claim is actionable upon use of the attachment or whether the plaintiff must await a favorable resolution of the related civil action.  I am inclined to view the plaintiffs' claim as a hybrid claim, despite the focus on the attachment writ, because the plaintiffs' allegations are framed in a way that calls into question the existence of cause for the entire fraudulent transfer action, and not just for pursuit of the writ.[13]  On the other hand, when the abuse of process claim is compared to the remaining tort claims, it is noteworthy that all of those claims have a tendency to encroach upon the dispute currently before the Superior Court.  This abuse of process theory is, therefore, not unique in its tendency to overlap with the fraudulent transfer action.  Moreover, the plaintiffs allege that the defendants made grossly false statements concerning the value of their claim, which may have impacted the creditors' response, and concerning the degree of completion of construction, which may have influenced the Superior Court in regard to the likelihood of further disposition of the property.  In theory, these issues could be determined by a fact finder without delving into whether the plaintiffs participated in a fraudulent transfer.[14]  On balance, I recommend that the Court dismiss count IV (wrongful use of civil proceedings), because the fraudulent transfer action has not resolved in the plaintiffs' favor.  I also recommend that the Court retain count III (abuse of process) because, although the factual allegations lean heavily toward lack of probable cause for the use of the attachment process—allegations that are

---

[13]    Note that the allegations complain about the "initiation" of the proceedings. (Verified Compl. ¶¶ 66, 71, 72.)  The focus on the grounds for initiation of the proceeding is demonstrative of a dispute over the existence of cause to pursue the writ of attachment, rather than abuse of the writ obtained.

[14]    There is currently no basis in the record to determine that the Superior Court considered the attachment process to have been abused.  The plaintiffs allege: "On November 29, 2007, upon motion of David Hoffman, Justice Cuddy of the Maine Superior Court entered an order dissolving the attachment."  (Verified Compl. ¶ 52.)  The fact that the attachment was dissolved does not raise an inference that it was dissolved based on a finding by the Court that there was no cause for the motion.  For example, the Superior Court could have dissolved the attachment as to the property in question based upon the presentation of adequate cash or a bond to serve as security. Me. R. Civ. P. 4A(h).

dependent upon a successful outcome of the state court proceedings—plaintiffs also allege use of fraudulently acquired process for an unintended purpose. But for the fact that the parties' dispute is currently bifurcated between the Superior Court and this federal court, both actions could be conveniently consolidated for purposes of trial, without running the risk of duplicate proceedings and inconsistent rulings. Nevertheless, it is theoretically possible that the abuse of process claim, with its allegations of exaggerated value and improper ulterior motives, inhabits a narrow gray area that is ultimately not dependent upon the success or failure of the fraudulent transfer action.

### 4.     *Immunity by comity*

The defendants argue that sovereign immunity bars all claims against them for money damages, citing both Connecticut law and Maine law. (Mot. to Dismiss at 7.)  This aspect of the motion arises under Rule 12(b)(1). Although the defendants note that the Court may look beyond the pleadings to resolve a contest over subject matter jurisdiction, they mount only a sufficiency challenge. See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 364 (1st Cir. 2001) (distinguishing between sufficiency challenges and evidentiary challenges). They do not propose an evidentiary contest and seek only to introduce documents *via* judicial notice. Consequently, the Court is tasked primarily with considering the plaintiffs' allegations, taking them as true, and determining whether, with the aid of reasonable inferences, they are sufficient to justify the exercise of subject matter jurisdiction. Id.; Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003). The allegations are supplemented only to the extent of a copy of the state court docket (Doc. No. 19-2) and a "case detail" maintained by the State of Connecticut Judicial Branch in the enforcement proceeding against Sunrise Herbal Remedies, Inc., Sage Advice, Inc., and Valerie Hawk-Hoffman (Doc. No. 19-3). I have taken notice of the Superior Court's docket,

which reflects that the individual defendants are not parties in that action and do not serve as counsel of record.

"The doctrine of sovereign immunity is an amalgam of two quite different concepts, one applicable to suits in the sovereign's own courts and the other to suits in the courts of another sovereign." Nevada v. Hall, 440 U.S. 410, 414 (1979).  In the latter scenario, whether immunity is extended to the defendant sovereign and its agents is determined by the forum state's law. Kiowa Tribe v. Mfg. Techs., 523 U.S. 751, 761 (1998); Nevada v. Hall, 440 U.S. 410, 416-18 (1979); Schooner Exchange v. M'Faddon, 11 U.S. 116, 136 (1812)).  The claim of immunity must have a source "found either in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity." Hall, 440 U.S. at 416.[15]  As far as the state law claims are concerned, the availability and extent of any immunity for Connecticut and its agents is a function of Maine comity principles.  The Maine Supreme Judicial Court has not addressed the question of whether, or on what conditions, it will extend immunity to a sister state or its agents.[16]

In Harvis v. Board of Trustees of the University of Illinois, the Maine Superior Court declined to extend immunity to an Illinois state institution where an analogous Maine entity

---

[15]   The Supreme Court observed in Hall that "as States have begun to waive their rights to immunity in their own courts, it was only to be expected that the privilege of immunity afforded to other States as a matter of comity would be subject to question."  440 U.S. at 417 n.13.

[16]   Ultimately, the question of whether or not Maine courts would extend sovereign immunity to Connecticut in this case will be a policy determination.  It might well be the type of question that should be certified to the Maine Law Court, but I do not recommend undertaking that process at the pleading stage.  One of the comity considerations might well be the extent to which the State of Connecticut has insurance regarding this sort of proceeding and the record is currently silent on this issue.  There is also the unresolved factual determination of whether or not Fitzsimmons or any other agent for Connecticut  made statements to third parties that exceeded the scope of the common law absolute privilege for relevant litigation statements.  If the factual record does not support those pleading allegations, the torts of defamation and tortious interference may evaporate on the summary judgment record.  If that happens, this Court will never have to reach the sovereign immunity issue on those claims.

would have been subject to suit on an identical cause of action and where the Illinois Court of Appeals had only recently declined to extend immunity to an Indiana institution sued in Illinois.[17]  No. CV-88-95, 1989 Me. Super. Lexis 76, *4-*5 & n.1 (Me. Sup. Ct., Knox Cty., May 15, 1989).  Implicit in the analysis is the possibility that immunity via comity should be extended under appropriate circumstances.  One consideration is whether Connecticut would likely extend immunity to a Maine defendant if the roles were reversed.  The Connecticut Supreme Court has not to my knowledge addressed the issue.  The Superior Court of Connecticut, however, has declined to extend immunity in two instances involving claims against agents of another state. Both cases are unreported.  In one, the court denied a motion to dismiss brought by the Florida Department of Citrus and the Florida Citrus Commission, third-party defendants, based on the fact that the Florida institutions were not engaged in governmental acts in connection with the underlying cause, but were acting as commercial participants in the Connecticut marketplace. Veroczi v. Big Y Foods, Inc., CV 96337521S, 1997 Conn. Super. Lexis 2795 (Conn. Super. Ct., Dist. Fairfield, at Bridgeport, Oct. 20, 1997).  In another, the court declined to extend immunity to Texas A&M University, a third-party defendant, or its employee, the individual defendant, where the cause alleged negligent operation of a motor vehicle, and where Connecticut's statute waiving sovereign immunity allowed for full recovery on a claim based on negligent operation of a motor vehicle.  Perrino v. Yeager, No. 50 55 81, 1991 Conn. Super. Lexis 2211 (Conn. Super. Ct., Dist. New London, at New London, Sept. 27, 1991).  Implicit in all of the foregoing cases is

---

[17]       Days after the Harvis decision was issued, the Supreme Court of Illinois extended immunity to an Indiana state institution where immunity would have existed for Illinois had it been the defendant in the action. Schoeberlein v. Purdue Univ., 544 N.E.2d 283, 287-88 (Ill. 1989).  The Schoeberlein decision offers a good template for consideration of the immunity question and collects cases on both sides of the issue.  Id.  According to the Schoeberlein Court, "the generally accepted rationale of the States that have not, through comity, accepted another State's claim of sovereign immunity is that a sister State's claim of immunity will not be recognized if the forum of litigation permits recovery against the home State under similar circumstances."  Id. at 288.

the idea that sovereign immunity could be extended in Maine or in Connecticut to agencies or agents of another state where immunity would exist for the defendants in their home forum and would also exist for a similarly situated agency or agent of the forum state. I conclude that, if the Law Court would extend sovereign immunity to a sister state, its agencies, institutions, and employees, it would only do so, minimally, if both Maine law and the sister state's law would afford immunity for the specific claim at issue. See, e.g., Franchise Tax Bd. v. Hyatt, 538 U.S. 488, 493-94 (2003) (describing the claim-specific analysis undertaken by the Supreme Court of Nevada).

The Maine Tort Claims Act (MTCA) provides that all governmental entities are immune from suit on tort claims seeking money damages, with only limited exceptions, none of which would apply to the allegations in this case. 14 M.R.S. §§ 8103, 8104-A. Because none of the section 8104-A exceptions apply in this case, the MTCA would confer absolute immunity on a Maine governmental entity in the position of the State of Connecticut or its Department of Consumer Protection. Dall v. Caron, 628 A.2d 117, 119 (Me. 1993). But would the State of Connecticut hold itself immune from suit? The defendants argue that Connecticut would, because Connecticut law requires claimants to submit a claim to the Connecticut Claims Commissioner in order to obtain relief from the State of Connecticut.[18] (Mot. to Dismiss at 8.) I am not persuaded that the Law Court would regard the claims submission procedure as a mandatory prerequisite to a suit filed by a Maine citizen for torts occurring in Maine. There would need to be, in my view, some additional indication that the kind of claim advanced could

---

[18]     In Connecticut, unlike in Maine, there is a Claims Commissioner who may authorize suit against the State "on any claim which, in the opinion of the Claims Commissioner, presents an issue of law or fact under which the state, were it a private person, could be liable." Conn. Gen. Stat. § 4-160(a). If the commissioner authorizes suit, then the state is deemed to have waived its immunity from liability and the state's liability is coextensive with the liability of a private person under like circumstances. Id. § 4-160(c). The filing restriction and limitation provision is found at sections 4-147, 148 & 160(d).

not be maintained against the State of Connecticut even if it were appropriately presented to the Claims Commissioner.  I also note that, although Maine law extends absolute immunity to the State of Maine and its subsidiary governmental entities, it waives immunity if the entity has procured insurance covering the claim.  14 M.R.S. § 8116.  The Court cannot resolve this question based on the record before it.

As for the individual defendant, the MTCA extends absolute immunity to governmental employees for performing or failing to perform a discretionary function, whether or not the discretion is abused, as well as for the performance of "any prosecutorial function involving civil, criminal or administrative enforcement."  Id. § 8111(1)(C), (D).  The balance of this case is premised on intentional torts arising from false and defamatory communications with third parties and the introduction of a false affidavit in order to abuse Maine process to secure a writ used for an allegedly improper objective.  These claims do not describe a proper prosecutorial function and, thus, would be analyzed in accordance with the MTCA's discretionary function immunity.  The MTCA extends absolute immunity to state employees on claims arising from discretionary acts or omissions, whether the acts are classified, for purposes of tort law, as negligent or intentional acts, and bad faith is no exception.  Grossman v. Richards, 1999 ME 9, ¶¶ 4-5, 722 A.2d 371, 373.  If the act in question does not fall within the discretionary function category, the statute still would extend "absolute immunity" with respect to "[a]ny intentional act or omission within the course and scope of employment," but only if the employee's actions were not in bad faith.  14 M.R.S. § 8111(1)(E).

Connecticut law is somewhat similar when it comes to the immunity granted to state employees.  As a corollary of its consent to be sued in circumstances where a private person would be liable, Connecticut extends immunity to state officers and employees:

> No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter.

Conn. Gen. Stat. § 4-165(a). However, although Maine law extends absolute immunity to employees whose conduct can be classified as a discretionary function, including acts performed in bad faith, the immunity that Connecticut law extends to Connecticut employees is qualified rather than absolute. Kelly v. Albertsen, 970 A.2d 787, 790 (Conn. App. Ct. 2009). In Connecticut, when a motion to dismiss raises the issue of statutory immunity for state employees under § 4-165, the court must "examine the pleadings to decide if the plaintiff has alleged sufficient facts . . . with respect to personal immunity under § 4-165, to support a conclusion that the defendants were acting outside the scope of their employment or wilfully or maliciously." Martin v. Brady, 802 A.2d 814, 817 (Conn. 2002).

The plaintiffs in this action allege bad faith (malice) on the part of Fitzsimmons. The plaintiffs also allege that Fitzsimmons acted in both his personal capacity and his official capacity. (Verified Compl. ¶¶ 50, 57, 63, 67, 74, 79, 85, 92.) Moreover, an abuse of process claim is inherently premised on the existence of bad faith. Thus, even if the allegations underlying the claims describe conduct falling within the discretionary function category,[19] such that a Maine employee would enjoy immunity despite allegations of malice and bad faith, the law of Connecticut does not appear to be so generous. On the other hand, defendants have cited persuasive authority to the effect that they would enjoy sovereign immunity in Connecticut for

---

[19]     Four factors determine whether an act, omission or decision qualifies as a discretionary function:  (1) whether it necessarily correlates with a basic governmental policy, program, or objective; (2) whether it is essential to the accomplishment of that policy, program, or objective;  (3) whether it requires the exercise of judgment and expertise;  and (4) whether the agency possesses the necessary authority and duty to perform it.  Tolliver v. Dept. of Transp., 2008 ME 83, ¶ 19, 948 A.2d 1223, 1230.

statements to third parties made as part of a public announcement concerning matters within their general supervision.  (Mot. to Dismiss at 24, citing <u>Hultman v. Blumental</u>, 787 A.2d 666, 674 (Conn. 2002).)  It may be that <u>Hultman</u> and Maine precedent such as <u>Gove v. Carter</u>, 2001 ME 126, ¶ 16, 775 A.2d 368, 375, combine in such a way as to justify an extension of immunity to Fitzsimmons and the State of Connecticut by operation of comity, at least as to the portion of the case involving extrajudicial statements.[20]   On balance, I conclude that a Maine court, particularly a court exercising simultaneous jurisdiction over the fraudulent transfer action, would withhold immunity from the defendants at the pleading stage to await further development of the case.[21]   For the present, I recommend that the Court treat the Connecticut defendants as it would private parties.

## CONCLUSION

For the reasons discussed herein, I RECOMMEND that the Court GRANT Defendants' Motion to Dismiss (Doc. No. 9), IN PART, by dismissing all claims against Farrell, Martinez, and Rosario because the plaintiffs have not established that this Court has personal jurisdiction over those defendants.  I also recommend that the Court grant the motion to dismiss as to Count I, slander of title;  Count II, violation of plaintiffs' substantive due process rights;  Count  IV,

---

[20]     The defendants have not cited authority to support a finding that Connecticut law confers absolute immunity to state executive officers on allegations involving fabrication of evidence, which would be necessary for sovereign immunity to cover the abuse of process claim.  If  this court accepts  my recommendation that the abuse of process claim involves allegations that are  independent of successful termination of the fraudulent transfer action and determines that it is a claim pertaining only to abuse of the *ex parte* attachment process, that claim survives the motion to dismiss.  I view that question as extremely close and difficult to determine at the pleading stage.

[21]     The plaintiffs argue in their motion that an extension of sovereign immunity to the defendants is foreclosed by the fact that the defendants removed this action from the Maine Superior Court, citing <u>Lapides v. Board of Regents of the University System of Georgia</u>, 535 U.S. 613 (2002).  (Opposition Mem. at 10.)  According to the plaintiffs, removal resulted in a waiver of sovereign immunity.  (<u>Id.</u>)  This is inaccurate.  The Eleventh Amendment extends a form of sovereign immunity to the states because it prevents federal courts from exercising jurisdiction over claims against a state commenced in federal court.  <u>Id.</u> at 618-20.   A state that removes an action to federal court consents to federal court jurisdiction, but it does not thereby waive its own, state law sovereign immunity with respect to state law claims.

wrongful use of civil proceedings;  and Count V, intentional infliction of emotional distress.  I

recommend the motion be denied at this time as to Count VI, defamation, and Count VII,

tortious interference with an advantageous economic relationship, to the extent that the claims

are asserted against Defendants State of Connecticut and Matthew F. Fitzsimmons.  Finally, I

recommend the Court deny the motion to dismiss as to Count III, abuse of process, to the extent

it is asserted against the State of Connecticut and Fitzsimmons.

### NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, and request for oral argument before the
district judge, if any is sought, within ten (10) days of being served with a copy
thereof.  A responsive memorandum and any request for oral argument before the
district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 7, 2009